May it please the court, Davina Chan on behalf of Francisco Rodriguez. I'd like to reserve five minutes for rebuttal. Before the Santa Ana Gang Task Force gave Simon Navarro Francisco Rodriguez's name and number and told him to make a contest. Before Simon Navarro told Mr. Rodriguez that the head of the Mexican mafia had gotten heard of Ismael Sierra's and wanted to make sure that retaliation was done properly in the streets. Before Simon Navarro ordered Francisco Rodriguez to attend mandatory gang meetings to plan a retaliation on threat of beat downs or worse. Francisco Rodriguez was planning a car wash to help raise funds for his friend's funeral. He had no thought of committing a retaliatory murder. The judge who sat through three trials had multiple opportunities to witness Francisco Rodriguez found that but for the present offense Mr. Rodriguez would be in college. This trial was waged on the terrain of predisposition. But although the government was allowed to use whatever it could find to prove predisposition, Mr. Rodriguez wasn't given a fair chance to rebut that showing. Dr. Pablo Stewart was not allowed to explain that the Penitentiary shootings were not evidence of predisposition to conspire to murder. Ava Statham was not allowed to explain that not every young man who grows up in the shadow of the West Myrtle gang, kicking it with them, associating with them, is predisposed to murder. By allowing the government to prove what it needed to prove but excluding the crucial evidence that Mr. Rodriguez needed to rebut the government's case, the district court violated not only the federal rules of evidence but Mr. Rodriguez's right to due process of law. Unless the court prefers I begin elsewhere. I'd like to start with Dr. Pablo Stewart. Well, let me make sure that I understand. The defense was entrapment. Yes. There's no question that prior incidents of bad conduct can come in as relevant when the issue is predisposition. That's correct. Okay. So your point is that, so what you, and the burden on predisposition is whose? The burden is the government. Okay. So your point is that he was not entitled to prove lack of predisposition or what is your overall general point? Yes, that he was not permitted to show lack of predisposition. So the government was required to show predisposition. One of the things the government sought to admit to show predisposition were these two acquitted shootings. And they were allowed to do that. My argument is that they should not have been allowed to do that. But once they were allowed to do that, and once the jury was instructed that these two shootings could be considered as evidence of predisposition, and let's be which is predisposition to conspire to murder in aid of racketeering. There was absolutely no way that Mr. Rodriguez could have a fair trial without putting in his defense. That's the end of the case. I think that's the end of the case. I mean, this, for Dr. Pablo Stewart's testimony was crucial to the acquittals in the first trial to allow the evidence in but not the defense. If we agree with you, do we need to reach any of the other issues? I would think that the only other issue you would need to reach is the instructional issue on the definition of predisposition because I think that the district court isn't going to make the same mistake on the first instructional issue. The second one I think is a very interesting issue because the Ninth Circuit has amended its entrapment definition almost every couple of years. I went to the Ninth Circuit Library right here and I checked them all out and I looked at every one. So about every three years the Ninth Circuit amends its instruction. And they keep adding things. So in 2010 they added this language that, I'm sorry I don't have it right here because it wasn't the issue I was, they added the language that, in determining, it's at ER 72, in determining whether the defendant was induced by a government agent to commit the offense, you may consider any government conduct creating a substantial risk that an otherwise innocent person would commit an offense. Now I concede that this language is in a million opinions. The Ninth Circuit says it over and over. But if you look at the holdings of the Ninth Circuit's decision, they actually contradict this. And I think that the two main cases that support that are Pullman and Cortez. So in Pullman we have a case where a guy likes to cross-dress and he likes beat. And so he's online and he's sort of trolling for someone who will be accepting of someone who likes to cross-dress and beat. And the government, posing as a mother of children, sort of draws him in and gets him to agree, I'll be your friend if you also teach my children how to have sex. And this goes on for a while and eventually he agrees to teach her children how to have sex. And the Ninth Circuit held that he had been entrapped as a matter of law. Now if this standard were correct, you may consider any government conduct creating a substantial risk that an otherwise innocent person would commit an offense. I don't think Mr. Pullman could have been found not guilty as a matter of law because offering to be friends with someone and give them adult companionship would not lead an otherwise innocent person to agree to molest children. Similarly in Cortez, a very recent case from this court, it's a stash house robbery case. The jury was given this instruction plus another instruction which was designed after a case called Spence. And that jury, it was a stash house robbery case and that jury was instructed that you couldn't consider the fruits of the robbery as entrapment. But the guy got up and he said, well I agreed to do it because I wanted to help my friends. And also the guy who said he was running the stash house said that the same thing had happened to my wife before. And this court reversed and re-enacted for a new trial. Again, if this were the standard, you may consider any government conduct creating a substantial risk that an otherwise innocent person would commit an offense. That case would have been harmless because there would have been no inducement. This idea that I felt sorry for the guy because he said the drug lord was having sex with his wife would induce someone to agree to rob a stash house, that sounds like it wouldn't fit within this. So I think if you agree with me with regard to the evidentiary issue, the only real issue you need to reach is this one. I guess it would also be good to reach the Ava Steffens issue because that issue would come up again. And with regard to Ms. Steffens, you know this is a case where the government put on eight different witnesses to testify that folks had stopped Mr. Rodriguez on Myrtle Street. He almost never didn't have any contraband, he never had tattoos, he wasn't wearing gangs or paraphernalia or anything like that, they just stopped him. In his closing argument, the government argued that the only purpose of West Myrtle was to conduct illegal activities. It spends eight pages of its answering brief recounting all these field identification stops. Well Mr. Rodriguez proffered Ava Steffens to sort of explain a different perspective. And as I understand your argument on this, it's basically that the district court applied a double standard, allowed the government witness but didn't allow your witness. If we separate that out though, it's an abusive discretion standard, right? So how can we reverse if we just look at Steffens, if we don't look at it as a double standard problem? Or do you have a case that says we should look at it as a double standard problem? I have cases that say that you should look at it as a double standard problem because they talk about one-sided evidentiary rulings being a violation of due process. I guess what I'm saying here is that if the court were inclined to reverse on this other issue, it could tell the district court that it wouldn't be an abusive discretion for Ava Steffens to be allowed to testify because they let in all this stuff, right? They let in all this stuff about how Mr. Rodriguez got stopped twice in one night, even he had no contradiction, but he got stopped twice in one night. Ava Steffens would have explained, this is what happens on most cases. But is there any reason the district court would think that the district court couldn't let that evidence in? It's just a discretionary decision, right? It's just a discretionary decision, but my experience is if this court holds blah, blah and doesn't reach this issue, it's quite likely that the district court will just say, all of my evidentiary rulings hold. That's what happened at the last appeal. We had an appeal, this court reached the main issue, which was an instructional issue, and then because I asked it to, it reached two evidentiary issues. On remand, the judge said, all motions in limine, everything is the same except for the two night circuits that I got wrong. And so I'm not saying that it would necessarily have been, if this were the only issue in the case, reversible abusive discretion error, but if this court is going to decide it, it might give guidance to the district court as to whether or not Ms. Steffens was in fact qualified. And you know, by the time she was going to testify, she had been working on Myrtle Street for 12 years, working specifically with at-risk youth. And so I understand, you know, you want to separate out. She might not have had to testify if the government wasn't allowed to put on eight separate witnesses to say, you know, he's a gang member. And so it's hard to separate it out because those witnesses were allowed to put on evidence for which the jury couldn't. Since he's a gang member, since he kicks it with Wes Myrtle, he's a predisposed murderer. You have a lot of argument in your brief about him not being a member of the gang or not having jumped into the gang until a certain date. But there's all this other evidence that he was somehow affiliated with the gang before that. I don't understand the significance of this jumped in. I mean, can you explain why you're making that distinction and what that distinction means to you? I can explain it to you. Ava Steffens would have been able to explain it to the jury even better. But this is somebody who, he lived on Myrtle Street, or a stone's throw from Myrtle Street. So yes, he associated with this gang. And he told people that he was a member. I mean, in various plea agreement and other contexts, he's actually identified as a member of this gang, it seems like. Well, he was required to admit to being a member of the gang in order to get that plea. That's true. And he testified in court that he was told, if I don't agree to this deal, it's seven years. If I agree, it's one year. So yes. And once he did that, once he admitted to being a member of the gang in a plea, and frankly, you don't even have to admit. Once the court finds that you're a member of the gang, it makes it part of your probation requirement that you identify as a member of the gang. Every time they stop you, you have to say, I'm West Myrtle. Because if you don't, you're in violation of the terms of probation. The reason why I talk about when he jumped in is because Ava Steffens would have testified that most people who jump in, jump in when they're young. Between the age of 11 and 14. Here's somebody who had been kicking it, hanging out with West Myrtle for so many years, but he didn't actually jump in until he was 19, which is way older than most gang members jump in. And he jumped in when he was 19, five months after the Santa Ana Gang Task Force first told Simon Navarro, bring him in. They didn't even know who Francisco Rodriguez was. That's the sick thing about this case. Because he went to the Orange County Sheriff's substation, gave a statement, told them his name, gave them his number, that's how he became a target in this investigation. The Orange County Sheriff's Department and the Santa Ana Gang Task Force got Francisco Rodriguez's number. We don't even know if he ever would have jumped into this gang. I just don't see why it matters, honestly. You have an argument about how they convinced him to retaliate. It seems like that's an argument totally independent of whether he jumped into this gang. And I actually found, I have to say, some of your briefing pretty disingenuous in drawing this distinction that really didn't seem to be a distinction. So I was bothered by that in an otherwise, I thought, persuasive brief. I'm sorry. Okay, your time is almost up. Go ahead. No, go ahead. I just wanted to set this up for the government here, that you're not now challenging the admission of the prior shootings, but your principal argument is really that you should didn't show predisposition because of his mental state. Is that... I do challenge the admission, but I do agree that my stronger argument... Stronger argument is what I just... Dr. Pablo Stewart was required to be allowed to testify. Okay, thank you. Now this, here after his friend was killed, then an informant came along. And that informant then did what? That informant said, you know, I heard from Sana, the big homie, about the murder, and your name came up. So we want to make sure that we take care of this right, because otherwise we're all going to be in trouble. Otherwise what? We're all going to be in trouble. There's going to be a green light. In other words, Mexican mafia is going to let people kill us if we don't take care of this properly. So here's a guy who's just, you know, hanging out with his friends who are gang members, planning car washes, goes to the Orange County, you know, it's identified as a friend of Ismael Sierra's, goes to Orange County Sheriff's Department, gives his name, and next thing he knows, someone is telling him that Sana, the big homie, needs to make sure that he takes care of this retaliation correctly. Well, it seems to me that it was that informant that got him on the wrong path to begin with. I agree. So how do we handle that? We revamp for another trial, so that the jury... This would be what, the fourth? Trial number four. We're hoping that the government will give up. That was trial number four. That's right. Yeah. All right. Well, I have to tell you a little story. I'll be quick about it. There was a young man that I know, lived up in San Fernando, that was in a vehicle. He was a gang member, and someone in that vehicle pulled out a gun and killed another gang member. This young man was probably about 16 years old, and had this conspiracy business, and he was convicted. And he was treated as an adult, and sent to state prison, whatever it was, 20 to life. He's in state prison, and he starts taking classes. And by the time he left the prison, he'd already earned his GED, and he already was earned about three years of college credits. And then he was on parole. He went over to Pierce College, where my wife teaches, and he got in the animal tech program. And a fellow named Shapiro, who runs that program, realized that this was a very brilliant person. And he's considered to be one of the brightest people that ever went through that school. And he got into vet school, even though he disclosed his past. And then he passed all the tests. He was number one in his class. And offered jobs all over the country. But he came back to Pierce College. He's married now, and he's going to take over that position. They have a big veterinary program. And one day a week, he's going to take care of other people's pets and animals for free. See? That's what happens sometimes to kids who are in gangs that are treated that way. And he goes around talking about it. I mean, it certainly sounds like he benefited a lot from the deterrent and rehabilitative. Oh, I don't think he benefited from that at all. You think that did? It made it a lot tougher on him. And some of those other kids have got the same. Here you had a young man that is drawn into it by an informant of the police that goes in and starts talking to this kid and tells him, well, you know, you're going to have to do this and that or this is going to happen to you. And, of course, he's upset because his friend was killed. And draws him in. How old was he then? I think he was an adult by then. He was over 18. How old was he? I think he was 19, but I'm not sure. I don't think so. I don't think so. He got drawn in. And then look what happened. So, you know, that's what happens when we have these informants who is probably, the guy was probably a drug addict himself, the informant. Wasn't he? No, he had some history of drug use. He had some history of drug use. How did he become an informant? Because he was tied in with a law enforcement officer who told him what to do. Your Honor, let me start by making my appearance. I'm just trying to educate you. I appreciate it, Your Honor. We've got to start thinking about those things and what's happening to a lot of young people. Mark Uhallam on behalf of the United States. Let me start, Judge Ferguson, by trying to hopefully flesh out your understanding of this defendant and the background, although this doesn't directly go to the issues. I sense that it is color. And the other thing is that once the judge allowed in the evidence, the fact that he'd taken shots at two other people, and he got acquitted on that, that's the end of the ball game. As soon as the jury hears that, the curtain comes down. I mean, you know, I've sat, I was on the Superior Court, and one year I probably dealt with 110, 120 felonies a month. So you get a lot of good experience that way. Anyway. So the defendant was not drawn into the gang by the informant. From a very early time in his life, he was doing things like tagging and placking, bloody brawls in reformatory school on behalf of the gang, announcing retaliatory tax against other gang members in the reform school, pouring chemical cleaner all over another kid. I think we can, let's assume he was a member of the gang from when he was six years old. I'm willing to give you that. So then he comes out of his juvenile detention phase. He goes to this party with two other armed members, gang members, and at that party his friend is shot. He goes in and makes a statement to the police. The statement is largely false. He denies knowing who the victim was and generally fails to help them with their investigation. The law enforcement angle here is serious concern, legitimate concern that he may retaliate. So they ask the informant to go to him and not say, you need to take care of this on the street, but to say there will be no retaliation without a green light, period. We will take care of this, as in I, the informant, and my side will take care of this. And they try to bring him into a meeting in order to reinforce that message. This is not a case where the defendant was leading a law-abiding, happy life of car washes in college until he was strong-armed and entering into a gang. Now, turning to the mental health defense, I want to correct what I think is a slight misstatement by my opponent. My opponent said that the mental health testimony as to the Petiton shootings at the Red Roof Inn was the critical part of their defense in the first trial. In fact, here's what the trial counsel said. Defendants submitted supplemental excerpts of record, but they stopped mid-transcript. They stopped mid-sentence, actually. This was the fourth trial, huh? Yeah. Why does it take so long? Well, there was an erroneous instruction in the first trial, and there was a hanged jury in the second. Now, at sentencing, the defense counsel says, with respect to— Then there's an erroneous instruction in the last trial. Can't we ever get these things right? Well, I think complicated trials often do have errors in them, and that's why there's the harmless error standard. Now, with respect to the psychiatric— Well, the harmless error standard, as one judge has said, is the last refuge of the scoundrel. I think the harmless error standard is a reasonable understanding— That's Judge Noonan. He doesn't mind my quoting him. I don't mind your quoting him either, Your Honor, but I think that as the quote about patriotism being the last refuge of fascists, I think it's a statement that is maybe overbroad and not always true. I think the harmless error is, in fact, a standard that, in addition to being mandated by the law— But it's overused, isn't it? No, I don't think it is, Your Honor. I think it is. Every time they do something wrong that's prejudicial, that's harmless. What do we have to worry about them? They're guilty as hell to begin with. Well, if it is prejudicial— It reduces the sense of maintaining high professional standards. Well, we could have a long philosophical discussion. I think that as you increase the number of procedural requirements on the courts, inevitably there will be errors. Just as sometimes there are errors from this court, sometimes there are errors in the government's briefing and defense briefing. And the question is whether— Well, we've been told many times we've committed errors. Now, I just— Only the Supreme Court is perfect, you know. Even the Supreme Court, Your Honor. No, they're perfect. Even Homer sometimes is not. No, they're perfect. So I do want to get some of this out. So with respect to the expert, what trial counsel said— This is the sentence that's excluded from the excerpt of the record. You're talking about Stewart now? This is with respect to Pablo Stewart. Trial counsel said, The defense didn't rise or fall on the psychiatric testimony. Rather, the evidence on the Red Roof incident was largely defendants' own words, where he described in detail what happened and how he believed that Efrain Patatin was about to shoot Cardenas. And moreover, with respect to all of that evidence, trial counsel—this is defense counsel—said, I don't know how much weight the jury gave it or not. So this notion that this was the key evidence and was kicked out I think is inconsistent with what trial counsel said before it was advantageous to argue that on appeal. Can you explain the logic of admitting the shooting from the Red Roof and excluding the expert? What purpose this was for? Sure. So the reason why the testimony about the Red Roof Inn is admissible is that it is relevant to predisposition even if there was not malice aforethought. Why? How? Sure. So here it's important to sort of drill down on what exactly the defense expert and the defendant said, which was not that defendant had entered into a somnambulance fugue state and suddenly woke up and there was blood everywhere. It was instead that the defense expert testified that he had this exaggerated response and sort of a hypersensitivity. And what defendant himself said was that he was thinking about, when he shot the petatons, he was thinking about his friend Sierra's death. He said that— So it's basically a PTSD-type theory, right? That he witnessed the death of— What trial are we talking about now? I'm getting confused here. His testimony about this changed over time, but at least as of the second and third trial, what he said was not that he blacked out, but simply that he panicked, essentially. Because of PTSD, because of this earlier incident. Correct. And then after that, the defendant characterized it as gangbanging and said it was something he wanted to do to help not just his friend, but something that gang members do. And that before he carried out the shooting, before the fight, he had identified himself as being from West Myrtle. And so, if the shootings had truly been something where someone went into a fugue state and woke up with blood on them, then there might be an argument that it is completely irrelevant to predisposition. But predisposition is actually a fairly inclusive standard. It is true that it has to ultimately show predisposition to the offenses, but that doesn't mean that the prior offense has to be identical. For example, you could imagine that someone who tortures animals, you might introduce the torturing of animals as evidence of predisposition to kill somebody. But it sounds like you're willing to give that if he was saying he blacked out, that that would be relevant. But so, isn't this pretty similar? I mean, the doctor was going to get up and say he had PTSD, he had some kind of irrational response, trigger response, because of this earlier incident that made him not plan what he was doing and react spontaneously. How do you get from react spontaneously without thinking because of PTSD to planning a murder intentionally? Right. So, it's that it shows a willingness to use violence on behalf of your friends, albeit in their defense. It shows that when carrying out these acts of violence, what he was thinking about was the same friend who he would later be avenging. But, I mean, wouldn't that have been a fact dispute? So, if the expert had been able to say, yes, he was thinking about Sierra, but he was having this flashback of Sierra, and so he reacted in this PTSD-induced state, that doesn't sound like planning revenge for a friend. But no one was arguing, the government was not arguing, that the Pentaton shootings were, at this stage, we weren't arguing that it was premeditated or that it was part of a plan. Could you help me out? This is where I'm, the result in the second trial was, what was the verdict? It was a hang. Hang as to? Only these counts were issued in the second trial. So, the same two counts on which he was convicted in the third trial hung at the second trial. And at the second trial, the expert testified, and testified as to inducement and predisposition, but did not testify about, at least, did not testify at length about the mental state of the defendant at the time of the Red Roof Inn shootings. So, the expert did testify at length in the second trial. And, you know, basically the expert was widely discredited in cross-examination, because it turned out he hadn't read some of the studies he relied upon, he couldn't really explain his methodology, he admitted that he had added new symptoms between the first and the second trial that were effective for rebutting the charges. But that doesn't make any difference if he was important to the defense, right? Well, it potentially weighs on the relevancy of the testimony in 403 factors, because, you know, if a method that an expert is going to put on is dodgier, then the probative value side of the scale would go down somewhat. And, in any event, the defendant didn't call him in the third trial, and defense counsel explained that. But there was a motion in Lemonet ruling that said he couldn't testify as to the mental state at the time of the Red Roof Inn, and that's the only issue here. So, when you say they chose not to call him, aren't you talking about a different issue? That was before the second trial. So, let me take a step back and describe procedurally what happened. At the first trial, the doctor testified with respect to his mental state at both the time of the Red Roof Inn shootings and his general PTSD condition. He's acquitted at that trial of the Red Roof Inn shootings as murderers. Then we come to the second trial. At the second trial, the government moves in Lemonet to exclude the testimony with respect to the mental state at the time of the Red Roof Inn shootings and prevails on that motion. The second trial takes place. The doctor testifies again at the second trial. So, the second trial, he's not tried for premeditation. He's tried for what? He's tried just for the conspiracy and for helping the gang. And at the second trial, he testifies. And then the third trial rolls around. You're talking about the expert now to Dr. Stewart. Correct. And wasn't there a ruling at the third trial that the motions in Lemonet from before would still be applicable? Correct. So, I'm not saying that he withdrew any claim with respect to this issue on appeal or anything. It's simply that they weren't prevented from calling Dr. Stewart at all. Right, but it's irrelevant if he can't testify as to the issue that they're worried about. Well, they did call him in the second trial to testify. Right. And the issue that they were really worried about, I mean, I think there is a little bit of goalpost shifting on the side of the defense. They had Dr. Stewart completely retool his testimony to focus on whether or not the defendant would be susceptible to inducement by Navarro. And that was his new report. Right, well, they did that after the motion in Lemonet, right? Yeah. After the motion in Lemonet ruling said they had to. Right. But, in any event, he did testify on inducement and on predisposition at the second trial. So, it wasn't that they excluded any mental health defense. It was merely an exclusion with respect to this sub-area, which was... But the sub-area is what's at issue here. So, we still have a motion in Lemonet ruling that he couldn't testify as a sub-issue, and that's what they're appealing. Correct, correct. But I think I just want to respond, I was trying to respond to a point that the expert was excluded entirely or that a mental health defense was excluded entirely, which is not so. It is true that the expert was not able to testify at length, although he did testify a little bit about the mental state the defendant had with the Red Roof Inn shootings. And the defendant, of course, testified at length about his own mental state. So, what this really was about was whether or not the expert would testify, in addition to the defendant, on this subject. Well, why isn't that important? I've never quite understood why that's not important. Sure. I mean, again, I would start by saying that, look at what the trial counsel himself said, which is that the defense didn't rise or fall on this idea. Is that after the second trial? That is after the third trial. Wait. Wait, when did the defense counsel say the things you're quoting? After his conviction at sentencing. Talking about the expert testimony in which trial, though? Looking back to when? So, he was referring to the first trial and the use of the expert in the first trial, which is when the expert did testify about the Red Roof Inn shootings. And with respect to the first trial, where a defendant could put on the expert for whatever he wanted, defense counsel said the defense did not rise or fall on the psychiatric testimony. I don't know how much weight the jury gave it or not, and the evidence was largely defendant's own words. So, that's what defense counsel said. But don't the words connect with the expert testimony? I mean, he says, I was thinking of Sierra, and the expert puts that in context and says it's PTSD. It seems like the two really go together. Yeah, because the expert can't testify as to the facts. Right. So, I mean, let me then just pivot to harmlessness, which is that ultimately, unless the court has no interest in hearing about harmlessness. No, I was just looking at my colleague. No, no, it's all right. Go ahead. I'm enjoying myself. So, the defendant had to show both inducement, or rather, the government would have to show both a lack of inducement or, alternatively, a predisposition. But the government could prevail on either of those things. So, one, the primary argument was really not predisposition. It was on inducement. And that is not what that testimony that was excluded went to. The testimony that was excluded went to predisposition, whereas if you look at the party's closing argument. Right, but what you're left with is, this guy shot two people and killed them, and we have no explanation, and it's incredibly prejudicial. So, at that point, it affects everything. I mean, he could have been charged with child molestation. He might have been convicted. I mean, it doesn't matter what the theory is. He has this incredibly prejudicial stuff that got in with no explanation. There's not no explanation. Defendant does furnish an explanation at length on the stand, both in direct and cross-examination. And that explanation is, I was afraid for the lives of my friends. When I thought about what had happened to my other friend who had been killed, I intervened to save their lives. And then the judge says, This is not murder. There was no malice aforethought. You are not to treat this as a crime. And so, I think the way those dovetail together. Did he actually say, You're not to treat this as a crime, or just the first two things? Well, I think he instructs them that there is neither. He says that he is not on trial for this offense. You are not allowed to consider it as a basis for punishing him, except with respect to predisposition. And that it's not murder and there's no malice aforethought. You're right that he doesn't say, This isn't some other crime. But he does tell them not to independently consider that as a basis for convicting the defendant, to punish him for that conduct. And so, I mean, this isn't the case where there was just an event happened without any explanation for it. The defendant did get to put on his explanation. And that explanation was essentially affirmed by the court in saying this wasn't murder. Obviously, if you shoot two people, ordinarily that would be murder. But if you say I did it in defense of my friends, then it would not be murder. And by instructing the jury that it was not murder, the court essentially ratified what the defendant had testified to in that respect on the stand. Okay. I guess we understand that. Does the court want to... Oh, yeah. You're over your time. I'm happy to sit down or I'm happy to discuss the step-ins or the other issues in the case. Did you handle all the trials? No. In fact, I didn't even get involved until... I was not involved in any of the trials or with the initial briefing on the appeal. I got involved just for the argument. And actually, if I can ask the court's indulgence on one small matter, which is the standard of review on the jury instructions, only because I want to dispel any impression that the government was trying to mislead the court on that. It appears that what happened is that the brief writer copied the standard of review section from the Ninth Circuit standard of review manual verbatim and that there are two errors in that manual which were replicated in public. Is that still true? It is still true. I think you want the page number? If you could give us the page number, that would be great. Yeah, it's page 104 of the 2012 edition. Maybe it's corrected in a later edition. Why don't you send us a little letter? We'll give you credit for it. You sent us a letter, but did you mention that part? No, I only discovered that a couple nights ago. You discovered it when? A couple nights ago while preparing for argument. So send us a note on that. I'm trying to get to sleep earlier. Thank you, Your Honor. Thank you. Thank you. I'm happy to answer any questions the court have. Otherwise, I mostly just have factual clarifications. I think it's because Mr. Yochalam has entered this case quite late. His argument was quite a few factual misstatements, so I just want to clarify those and answer any questions the court has. First, what he just said. The court did not instruct the jury that there was no malice aforethought. That is exactly the problem. The court instructed the jury that it was not murder, but gave absolutely no explanation as to why it was not murder. I cannot imagine what the jury was thinking. Oh, we just heard that this man shot and killed somebody, but it was not murder, but we're allowed to consider it in terms of predisposition. But the court absolutely did not say there was no malice aforethought, and the government, in its closing argument, did not say there was no malice aforethought. Instead, the government said, even if we credit his story, assuming for the sake of argument that it was self-defense, which is communicating to the jury that it did not believe that it was self-defense, that it did not believe that his story, in fact, the government's closing argument, was basically half an hour of calling Francisco Rodriguez a liar over and over. Francisco Rodriguez is a liar. You can't believe a word he says. Everything he says is a lie. So the idea that because Francisco Rodriguez testified that it was self-defense, that cures everything, I think, is highly problematic. The government argues that Pablo Stewart was totally discredited after the second trial, and that's why the defense chose not to call him again. I'm sure the defense's position is that the government's expert was totally discredited after the second trial, when it turned out that he had hired guns for the tobacco companies. So, you know what? The jury was allowed to hear all of it and make its own decision, but what the jury wasn't allowed to hear was what we're talking about today, which is that Francisco Rodriguez shot the Petitone brothers while suffering from post-traumatic stress disorder, increased arousal, exaggerated strong response, and hypervigilance. This is what the jury was not allowed to hear. So I understand that the government believes that he was totally discredited. I would disagree. And in fact, the court, in its holding, in its determination that it would not allow Pablo Stewart's testimony in again, said, I think the first jury believed it. At ER 54, the jury heard that testimony and one would infer from that verdict that the jury accepted that testimony in the first trial. So whatever Craig Wilkie said in his sentencing, in some totally different context, what we know is that the court believed that the first jury did credit the testimony and, in fact, the court credited the testimony, found it very compelling. And the other ones truly are just factual. The government said that Simon Navarro is not a drug addict. The record is perfectly clear. He is a drug addict. I have a lot of other factual clarifications. It sounds like the court doesn't need to hear them. Thank you. This matter is also submitted.
judges: Schroeder, Pregerson, Friedland